## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**PAUL D. PHILLIPS,**
              **Plaintiff,**

**v.**                                                    **CIVIL ACTION NO. 1:05CV147**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF**
**SOCIAL SECURITY,**
              **Defendant**.

### REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

Paul D. Phillips ("Plaintiff") filed his application for DIB on December 26, 2002, alleging

disability since July 25, 2001, due to herniated disc in his neck, diabetes, degenerative disc disease,

and arthritic changes (R. 66, 86, 98). The application was denied initially and on reconsideration

(R. 46, 53). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Randall Moon

held on December 16, 2003 (R. 288). Plaintiff, represented by counsel, testified along with his wife,

Libby Phillips, and Vocational Expert Tim Mahler ("VE"). The ALJ rendered a decision on March

23, 2004, finding that Plaintiff was not under a "disability," as defined in the Social Security Act,

at any time through the date of the decision (R. 25). The Appeals Council denied Plaintiff's request

for review on August 25, 2005, making the ALJ's decision the final decision of the Commissioner (R. 6).

## II. Statement of Facts

Plaintiff was born on January 18, 1951, and was 53 years old on the date of the ALJ's decision (R. 17, 66). He has a high school education as well as a college degree in marketing that he never used (R. 307). He has 22 years past work experience in receiving and distributing for the power company (R. 308). He last worked in 1998, and has received long-term disability from his employer since that time.

On March 23, 1998, Phillips was referred for an MRI of the cervical spine by Kelly Nelson, M.D., his treating physician (R. 210). The results of the MRI showed a mild reversal of the normal lordotic curvature of the cervical spine at the C4/5 level; the vertebral bodies had a normal appearance as well as normal marrow signal characteristics; anterior marginal osteophyte formation was present at the C5/6 levels; the craniovertebral and cervicomedullary junctions were normal; and the cervical cord had a normal appearance. A 3-4 mm central subligamentous disc herniation was present centrally at the C4/5 level. No impingement on the cervical cord was seen. Disc osteophyte complexes were present at the C5/6 and C6/7 levels. Again, no impingement on the cervical cord was seen.

Neurosurgeon Joseph L. Voelker, M.D. saw Phillips in the Neurosurgery Outpatient Clinic at WVU on April 20, 1998 (R. 221). Plaintiff reported that he first had an episode of neck pain four years earlier. The pain radiated into his left arm and was associated with numbness of the left hand. Over the years he had only occasional short-lived episodes of pain which he controlled with cervical traction. About two weeks ago, however, his duties at work changed which increased his neck pain.

2

He stopped work shortly after this and after approximately one day the symptoms subsided.

The doctor noted that Phillips was quite anxious and nervous during the office visit. His motor strength was normal in all groups and sensation was decreased over the left thumb. His reflexes were 2+ bilaterally and symmetric. The Tinel sign and Phalen's test were negative, as were the Spurling's compression tests. His neck was non-tender to palpation. He had pain with rotation of his head to the left and with neck extension. Dr. Voelker examined the cervical MRI and stated it showed a mild right C5-6 disc bulge and also a mild left C6-7 disc bulge. There did not, however, appear to be any underlying nerve root compression.

Dr. Voelker did not recommend surgical treatment because, although Phillips had a chronic pain condition, he had no radiculopathy on examination and no significant nerve root compression. Dr. Voelker did, however, opine that Phillips might benefit from a further course of physical therapy as well as anti-inflammatory medications. At this time, Phillips asked the doctor if he would qualify for disability. Dr. Voelker replied that he did not perform disability evaluations, and that if this information was needed, he would recommend Phillips be seen by a physician trained in disability determinations.

Dr. Nelson wrote to Dr. Russell Biundo on October 26, 1998, requesting a consultative examination of Plaintiff (R. 209). Dr. Nelson noted that the Department of Neurosurgery at WVU did not feel Plaintiff had a cervical lesion. He informed Dr. Biundo that "[a]t this stage, Paul basically thinks that he is disabled. He does not feel that he is able to do any meaningful employment."

Phillips was evaluated by Russell Biundo, M.D., on November 30, 1998, at the request of Dr. Nelson (R. 137). Dr. Biundo noted some herniated disc at C4/5 and some bulging discs as well.

3

He also noted some osteoarthritic changes across the cervical spine and anterior spur formation. Dr. Biundo reported that Phillips told him he had tried therapy for "many months, actually years," that he had been on multiple non-steroidal and other pharmaceutical interventions, and was at the time on Hydrocodone as needed for pain as well as Naprosyn which was helpful. Phillips reported the pain as a "tooth ache." He stated its onset was with sneezing, with intermittent duration. He stated that the pain was relieved by ice and rests in the easy chair.

Dr. Biundo stated that Phillips told him "he [could not] be involved in gainful employment because he [could not] handle the pain." He also informed the doctor that, for the most part, he constantly had to "take care of it" (the pain). He stated the pain was made worse by tapping on his head, sitting, standing or any jarring movements. He felt his upper extremity was weak.

Notably, Phillips told Dr. Biundo that he was "very concerned about being able to get on disability since he will not be able to take care of his two children." The doctor stated that it appeared that this would be very devastating for Phillips. The doctor also noted that "due to his current situation he (Phillips) feels that he is impaired. He (Phillips) feels that in all aspects he is disabled." Dr. Biundo concluded:

> Because of his complicated social system and his psychosocial status, it appears that he would best be fit to be disabled at this point. He seems to have a great concern for his family and children. He feels that he will loose [sic] everything if he returns to work because he would not be able to return to gainful employment and thus, not be able to provide benefits and insurance coverage, especially medical insurance coverage for his children.

> Thus, it appears best for this patient, and his family, for him to be disabled. Although I did recommend that there are different interventions that may be helpful even while he is on disability. He can somehow engage in some therapeutic intervention. He is still not interested in this at this point.

(R. 140).

4

Following Dr. Biundo's report, Dr. Nelson wrote a "To Whom it May Concern" letter regarding Plaintiff, stating:

> After a rather extensive evaluation, Dr. Biundo feels that Plaintiff would fit into the classification of being disabled at this present time. Dr. Biundo feels that he can offer Mr. Phillips some intervention which might help his pain and problem, but he basically feels that Mr. Phillips should be allowed total and permanent disability.

(R. 208).

On February 5, 2001, Plaintiff saw Dr. Nelson for a recheck (R. 204). He had lost three pounds and felt "pretty good." He was still nervous and anxious and shaky. He still reported pain in his neck and pain going down his arms. Otherwise he was "getting along pretty well."

On March 25, 2001, Plaintiff presented to Dr. Nelson for a recheck (R. 202). He reported still having significant pain, stiffness and soreness over his neck and pain radiating down his bilateral arms, right greater than left. He was "[j]ust a little bit stiff and sore."

On May 21, 2001, Plaintiff was "[g]etting along quite well, with the cough and congestion and sore throat. Also some stiffness and soreness over his neck. Otherwise the pain runs down his arms on an intermittent bases [sic]" (R. 196).

On June 20, 2001, Plaintiff reported he was "[s]till having stiffness and soreness down his neck. Real stiff and sore. Having some pain radiating down both arms, left greater than right" (R. 188). The doctor noted: "At this stage we are going to fill out some more disability papers on him. Refill his Lortabs. Return for problems."

On September 21, 2001, Plaintiff said he was "getting along well" (R. 186). He was "having a little bit of flare-up of his pain." He was "also having some muscle spasms, a little bit stiff and sore." The doctor bumped up his dosage of Lortab and gave him some Flexeril for the muscle

5

spasms to use on an as-needed basis.

On October 23, 2001, Plaintiff reported he "was moving a box yesterday and felt something pull in his hand. He had a little swelling" (R. 182). Upon examination, his hand had good range of motion and 5/5 strength. He was diagnosed with a fracture of the right fourth finger, and advised to "decrease activity."

On November 27, 2001, Plaintiff told Dr. Nelson he was still having pain over his neck with some radiation of the pain down his arms (R. 180). He was "just real stiff and sore."

On January 18, 2002, Plaintiff told Dr. Nelson he was "getting along fairly well" (R. 176). He had gained two pounds. He had been trying to diet and exercise but was having "a significant amount of neck pain running down his arm."

On March 18, 2002, Plaintiff reported getting along "fairly well" (R. 171). He was having "some pain of his neck and numbness down both arms. Real stiff and sore. Otherwise really no change in statis [sic]." Upon examination, Plaintiff had good flexion and extension, but was "real stiff and sore."

On May 16, 2002, Plaintiff told his doctor he was "getting along fairly well" (R. 167). He was having some stiffness and soreness over his neck, but was otherwise doing "OK." Dr. Nelson noted Plaintiff was "[j]ust a little bit stiff and sore both over his neck and his low back otherwise getting along well."

That same date Dr. Nelson completed a form for Plaintiff's disability insurer, opining that Plaintiff had persistent cervical radiculopathy (R. 286). The subjective symptoms were reported as "pain over neck and down bilat[eral] arms." The doctor opined Plaintiff's condition was progressively worsening. He limited Plaintiff to less than 30 minutes standing, less than 30 minutes

walking, and less than 30 minutes sitting, with a lifting limit of 10 pounds (R. 287). Dr. Nelson opined that Plaintiff had a severe limitation of functional capacity and was incapable of minimal(sedentary) activity. He also opined that Plaintiff had a permanent disability due to severe cervical radiculopathy.

On August 15, 2002, Plaintiff was still getting along "quite well" (R. 162). He had lost five pounds and felt "good."

Plaintiff next saw Dr. Nelson on October 23, 2002 for a recheck (R. 156). He was "[g]etting along fairly well," but "[s]till having significant soreness and stiffness, over his neck and his back. Otherwise doing pretty well. Trying to diet and exercise." Dr. Nelson told Plaintiff he would "dictate that letter to Social Security for you" (R. 157).

That same date, Dr. Nelson wrote a "To Whom it May Concern" letter, in support of Plaintiff's claim for Social Security Disability Benefits (R. 159). The doctor stated that Plaintiff had had pain over his neck for a number of years, "which is a result of a herniated disk in his neck." Dr. Nelson stated that Plaintiff continued to have bilateral cervical radiculopathy with pain in both arms as well as numbness, weakness and tingling in his left hand and upper extremity. He continued to suffer with stiffness and pain in his neck with frequent flare-ups of muscle spasms. From time to time he had "rather severe exacerbations with increased inflammation, which cause[d] him to not be able to sleep, which really limits any activities he is able to perform." The doctor noted these exacerbations were unpredictable and "not always caused by physical exertion," but that Plaintiff did have pain on an every day and ongoing basis and "certainly the pain happens so frequently and these flare-ups happen so frequently that he would not be a good candidate for work."

Dr. Nelson also wrote that Plaintiff was "often up basically throughout the night with pain,"

7

and that because of this and his medication "he does have a significant amount of daytime drowsiness and oftentimes has to take naps." He also noted that Plaintiff was "forced to change positions frequently from standing to sitting to lying and is unable to perform many of the activities of daily living."

Dr. Nelson concluded:

At this stage it is my opinion that this gentleman is totally disabled from any kind of work that he would be qualified for by any reasons, previous work experience, or education due to the combined effect of his above injuries and the medication he is on. I do not feel that he is able to engage in any substantial gainful activity or acquire skills or abilities comparable to those of any gainful activities in which he was previously engaged with any regularity over any substantial period of time."

On December 5, 2002, Dr. Nelson completed a form for Plaintiff's disability insurer, diagnosing Plaintiff with "Persistent Cervical Radiculopathy" (R. 152). He listed Plaintiff's "subjective symptoms" as "pain over neck and down bilat[eral] arms." He noted Plaintiff's progress as "progressively worsening." He opined Plaintiff was limited to standing less than 30 minutes, walking less than 30 minutes, sitting less than 30 minutes, and lifting less than 10 pounds. He checked off the box marked: "Severe limitations of functional capacity; incapable of minimal (sedentary) activity." As to the extent of Plaintiff's disability, Dr. Nelson noted Plaintiff had "permanent disability [due to] severe cervical radiculopathy." He noted Plaintiff was not a suitable candidate for further rehabilitation services, and that his job could not be modified to allow for his impairment.

On January 20, 2003, Plaintiff reported to Dr. Nelson that he was still "getting along fairly well," but was having "a progressive worsening stiffness, soreness over his neck, pain radiating down his bilateral arms." The doctor referred plaintiff for an MRI. That same day, Dr. Nelson wrote

8

to Plaintiff regarding his "somewhat high" cholesterol, and noted: "I really think it is time to get very serious about your diet and exercise program" (R. 151).

Plaintiff underwent a cervical MRI on January 23, 2003 (R. 146). The impression was:

1.     Right central herniation at C5-6 with cord impingement.

2.     Broad based herniation at C6-7 without cord impingement.

3.     Bulging disc at C3-4 and C4-5.

4.     Reversal of the cervical lordotic curve.

On January 28, 2003, Dr. Nelson noted the MRI, which showed "progressive worsening of the herniation" (R. 145). Dr. Nelson found Plaintiff was having constant right-sided radiculopathy. Dr. Nelson diagnosed herniation and radiculopathy and referred Plaintiff to Neurosurgery at WVU for further evaluation. Dr. Nelson discussed possible surgical intervention, although he noted Plaintiff was "quite hesitant to proceed with surgery." Otherwise, there was "really no change in his status," and Plaintiff was "getting along with stiffness and soreness and progressively worsening pain."

On February 26, 2003, Neurosurgeon Voelker saw Plaintiff again upon referral from Dr. Nelson (R. 218). He noted that Plaintiff presented with "a chronic history of neck and arm pain for approximately the last 10 years, however, his symptoms have declined over the last five years." Plaintiff stated he was having more symptoms in the right arm compared to the left. His pain on the right was "constant for the past month-and-a-half, located over the right biceps and into the shoulder." His left arm pain was intermittent, radiating from the posterior left arm into the lateral forearm, down into the thumb, index and middle fingers, with associated numbness and weakness on the left. Plaintiff stated that he had been able to "control his pain with cervical traction and ice

9

therapy at home until he performs any strenuous activities and then the symptoms return."

Upon physical examination, the doctor noted Plaintiff's gait was steady and muscle strength was within normal limits (R. 219). There was dysesthesia of the left C6 dermatome. Deep tendon reflexes were 2+ throughout. He had negative "Hoffman's." Dr. Voelker opined the January 23, 2003, MRI "revealed moderate disk bulge on the right at C5-C6, with mild neural compression [and] a mild disk bulge on the left at C6-7 with no nerve root compression."

The doctor opined that the right C5-6 disc change might be causing some of Plaintiff's right arm pain. Surgery would not help his chronic neck pain or left arm symptoms. He might, however, benefit from continuing physical therapy as well as anti-inflammatories.

On February 27, 2003, Plaintiff was examined by Kip Beard, M.D. at the request of the State Disability Determination Service (R. 223). Dr. Beard reviewed the cervical MRI, opining that it showed disc herniation at C5-6 with spinal cord impingement as well as abnormalities at C6-7 with cord impingement. Plaintiff had pain on range of motion testing of the cervical spine. There was paravertebral and spinous process tenderness. There was some paravertebral muscular rigidity without spasm. Plaintiff had flexion to 40 degrees, extension to 35 degrees, lateral bending 30 degrees to the right and 35 degrees to the left, and rotation 60 degrees to the right and 50 degrees to the left.

Plaintiff had shoulder girdle and neck discomfort with range of motion testing of the shoulders (R. 225). His range of motion was abduction at 110 degrees and forward flexion at 130 degrees. His elbows and wrists were without pain, tenderness, redness or warmth and had normal motion. Plaintiff's hands had no tenderness, redness, warmth or swelling, and had full range of motion. He was able to make a fist bilaterally and there was no atrophy. Grip strength was 100, 90,

10

90 pounds on the right and 40, 40, 45 pounds on the left. Plaintiff could button and pick up coins with either hand and write with the dominant hand without difficulty.

Neurologic examination revealed diminished sensation on the left distal arm affecting the first through third fingers, and questionable "maybe a slight degree of weakness of the left wrist," but strength still greater than 4- 4 ½ out of 5. (R. 226). Fine manipulation was well preserved. The mid-biceps measured 40 cm on the right and 30 cm on the left. The mid-forearm measurements were equal. Deep tendon reflexes were 3+ throughout. There was bilateral Hoffmann sign and two beats of clonus without Babinski. Plaintiff could heel walk, heel-to-toe walk, and squat, but had difficulty rising from a squat.

Dr. Beard diagnosed chronic neck pain – chronic cervical myofascial pain superimposed upon degenerative disc disease with spinal canal stenosis and evidence of early myelopathy; chronic lower back pain – chronic lumbar myofascial pain, probably superimposed upon degenerative disc disease; and bilateral knee pain, possibly due to osteoarthritis (R, 226). Dr. Beard opined that Plaintiff also had some limited shoulder motion associated with shoulder girdle and neck discomfort, that he ambulated with somewhat stiff neck posture, and had some difficulty with functional ambulatory testing associated with neck discomfort.

On March 18, 2003, State agency reviewing physician Thomas Lauderman, D.O. completed a Physical Residual Functional Capacity Assessment (RFC"), opining Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand/walk about six hours in an eight-hour workday, and could sit about six hours in an eight-hour workday (R. 244). He could occasionally do all posturals, except he could never climb ladders, ropes, or scaffolds. He would have no manipulative limitations (R. 246). He should avoid concentrated exposure to temperature extremes, vibration, and hazards

(R. 247).

Dr. Lauderman reviewed Dr. Nelson's October 2002, opinion that Plaintiff was "totally disabled," but disagreed, opining that Plaintiff could work at the light exertional level (R. 249).

On April 21, 2003, Plaintiff presented to Dr. Nelson for a recheck (R. 279). He reported "getting along well." Dr. Nelson noted Plaintiff was "doing pretty well." Physical examination showed Plaintiff was "still having some pain over his neck and some pain running down his arm." He was "a little bit stiff and sore."

On May 2, 2003, State agency reviewing physician Cynthia Osborne completed an RFC, with limitations nearly identical to those of Dr. Lauderman (R. 252). She also opined Plaintiff could perform work at the light exertional level.

On July 23, 2003, Plaintiff presented to Dr. Nelson for a recheck (R. 277). He again reported "[g]etting along fairly well." He had lost three pounds, and felt "pretty good." He did have "some pain in his neck [and] some stiffness and soreness down into his back as well."

On September 15, 2003, Plaintiff presented to Dr. Nelson for a recheck (R. 275). He was still "getting along fairly well." He told the doctor he had not been very adherent to his diet or exercise, which was obvious to the doctor because his weight and blood pressure were both elevated. Dr. Nelson encouraged Plaintiff to increase his diet and exercise (R. 274).

Later that same day Plaintiff returned to Dr. Nelson to "discuss his neck" (R. 273). He was "still having stiffness and soreness [and] had disability forms he wants filled out." Dr. Nelson filled out the forms. Under "prognosis," Dr. Nelson stated: "I think he is permanently and totally disabled."

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's neck pain syndrome with C5-6 and C6-7 bulging discs, degenerative spondylosis and a general anxiety disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. The claimant may meet the "A" requirements of listing 12.06. However, for the "B" requirements, he has "mild", "mild", "moderate", and "none", and does not meet these requirements. As there was no evidence of the presence of the "C" criteria, the claimant does not meet the "A and B" or the "A and C" requirements of listing 12.06.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: a limited range of light work. The claimant is unable to lift and carry any amount of weight frequently. Additionally, he cannot do work overhead. However, he can occasionally lift up to 20 pounds. He can sit for up to two hours in an eight-hour workday for up to one-half hour at a time. He can stand up to six hours in an eight-hour workday for up to one-half hour at one time and he can walk for up to six hours in an eight-hour workday for up to one-third of an hour at one time.

7. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8. The claimant is an "individual closely approaching advanced age" (20 CFR § 404.1563).

9.    The claimant has "more than a high school education" (20 CFR § 404.1564).

10.   The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

11.   The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.1567).

12.   Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 201.16 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an inspector/checker, with 111,000 in the national economy and 800 jobs in the regional economy; as a desk attendant, with 55,000 jobs in the national economy and 200 jobs in the regional economy; and as a laundry folder, with 48,000 jobs in the national economy and 300 jobs in the regional economy. The sampling of jobs provided by the vocational expert does not appear to have requirements in the *Dictionary of Occupational Titles* (DOT) that would exceed the limitations of the claimant.

13.   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(e)).

(R. 24-25).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept

to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.  The ALJ erred by not finding that the claimant's neck condition meets Listing 1.04 when the agency's own doctor made the necessary medical findings of nerve root compression, pain, limitation of motion, atrophy, weakness, and sensory and reflex loss.

2.  The ALJ's finding that the plaintiff can still do light work is not supported by substantial evidence when the same ALJ found the claimant could only do light work in July, 2001, three years earlier, and still finds that the plaintiff can do light work even though his condition has significantly worsened with MRI evidence of a herniated cervical disc with nerve root impingement and other herniated or bulging discs which were not present in 2001.

Defendant contends:

1.  Plaintiff does not meet § 1.04 of the Listing of Impairments.

2.  Substantial evidence supports the ALJ's Residual Functional Capacity determination.

### C. Listing 1.04

Plaintiff first argues:

The ALJ erred by not finding that the claimant's neck condition meets Listing 1.04

when the agency's own doctor made the necessary medical findings of nerve root compression, pain, limitation of motion, atrophy, weakness, sensory and reflex loss.

Defendant contends Plaintiff does not meet § 1.04 of the Listing of Impairments. Listing 1.04 provides:

Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.

With:

A.      Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The ALJ found that Plaintiff had some nerve root compression, limitation in his range of motion, and some pain. He found, however, that the record did not document motor loss. Plaintiff argues: "The medical evidence clearly documents motor loss with measured atrophy of 10 cm in the left arm, decreased grip on the left and slight degree of weakness of the left wrist," citing page 226 of the record. The undersigned notes that the Listing itself requires muscle weakness, even if there are signs of atrophy. The record Plaintiff cites is that of Dr. Kip Beard, an examining physician. Dr. Beard found the mid-biceps measurement was 40 cm on the right and 30 cm on the left. He also "question[ed] maybe some slight weakness of the left wrist and left grip strength is diminished compare to the right."[1] Just the day before Dr. Beard's examination, however, Plaintiff was

_____

[1]Listing 1.00E provides:
[A] report of atrophy is not acceptable as evidence of significant motor loss without circumferential measurements of . . . both upper and lower arms, as appropriate, at a stated point above and below . . . the elbow given in inches or centimeters. Additionally, a report of atrophy should be accompanied by

examined by neurologist Joseph Voelker, at the request of his treating physician. Dr. Voelker specifically found Plaintiff's "[m]uscle strength within normal limits." Dr. Voelker had also examined Plaintiff in 1998. In 2003, he noted Plaintiff reported "a chronic history of neck and arm pain for approximately the last 10 years, however, his symptoms have declined over the last five years," and that "today he is having more symptoms in the right arm than compared to the left. His pain on the right is constant for the past month-and-a-half . . . . His left arm pain is intermittent." Yet it is the left arm, according to Dr. Beard and Plaintiff, that had signs of weakness.

The two examining physicians' opinions conflict regarding muscle weakness, with Dr. Voelker finding Plaintiff's muscle strength was within normal limits, and Dr. Beard finding, one day later, that Plaintiff had diminished grip strength on the left and "maybe" some questionable slight weakness of the left wrist. The ALJ accorded Dr. Voelker's opinion significant weight. The undersigned notes that Dr. Beard is an examining physician who saw Plaintiff one time at the request of the State agency, and Dr. Voelker is an examining physician who saw Plaintiff twice at the request of Plaintiff's own treating physician (albeit five years apart). Although Dr. Voelker is only an examining physician, it is significant to the undersigned that his evaluation was sought as part of Plaintiff's treatment.

The Fourth Circuit stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. _King v. Califano,_ 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not find facts or try the case _de novo_ when reviewing disability determinations.");

---

measurement of the strength of the muscles in question generally based on a grading system of 0 to 5, with 0 being complete loss of strength and 5 being maximum strength.

*Seacrist v. Weinberger,* 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion."); *Blalock v. Richardson,* 483 F.2d at 775 ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.' ").

The undersigned finds the ALJ did not err by resolving the conflict between the two physicians' opinions in favor of Dr. Voelker's opinion. He therefore did not err in finding Plaintiff did not have the required muscle weakness.

Additionally, the ALJ's determination that Plaintiff did not meet the Listing is supported by the opinions of the State agency physicians. Dr. Lauderman noted Dr. Beard's findings. He expressly disagreed with Dr. Nelson's opinion that Plaintiff was disabled, opining that Plaintiff could work at the light exertional level. Dr. Osborne also opined Plaintiff could perform work at the light exertional level. 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

Further, only about six weeks after Dr. Beard's examination, Plaintiff reported to Dr. Nelson that he was "getting along well." Physical examination showed Plaintiff was "still having some pain over his neck and some pain running down his arm." He was "a little bit stiff and sore." (Emphasis added). Two months later, Plaintiff again reported "[g]etting along fairly well, although he did have "some pain in his neck [and] some stiffness and soreness down into his back as well." (Emphasis

added). There is no report of weakness.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 1.04A.

### D. RFC

Plaintiff also argues:

> The ALJ's finding that the Plaintiff can still do light work is not supported by substantial evidence when the same ALJ found the claimant could only do light work in July, 2001, three years earlier, and still finds that the plaintiff can do light work even though his condition has significantly worsened with MRI evidence of a herniated cervical disc with nerve root impingement and other herniated or bulging discs which were not present in 2001.

Defendant contends substantial evidence supports the ALJ's Residual Functional Capacity determination.

While the record does indicate some worsening of Plaintiff's neck condition objectively, there is no requirement that the ALJ correspondingly decrease his exertional level or increase his functional limitations. A mere diagnosis of a condition is not enough to prove disability. There must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163 (4th Cir. 1986).

In 1998, Dr. Voelker examined Plaintiff's MRI and stated it showed a mild right C5-6 disc bulge and also a mild left C6-7 disc bulge without any apparent underlying nerve root compression. Five years later, Dr. Voelker examined an MRI from 2003, stating it "revealed moderated disk bulge on the right at C5-C6 with mild neural compression [and] mild disk bulge on the left at C6-C7 with no nerve root compression." (Emphasis added). In spite of this apparent progression from no nerve root compression to mild nerve root compression, Plaintiff himself reported "his symptoms ha[d] declined over the last five years."

19

The final record cited by the ALJ in his 2001 decision was the February 5, 2001, report by Dr. Nelson, stating that Plaintiff felt "pretty good," still had pain in his neck and pain going down his arms, and was "getting along pretty well." Shortly before the ALJ's decision, Plaintiff was still getting along "quite well." He had "some stiffness and soreness over his neck [but] [o]therwise the pain runs down his arms on an intermittent bases." [sic]. Similarly, shortly after the MRI in 2003, Plaintiff reported to Dr. Nelson that he was "getting along well." Physical examination showed Plaintiff was "still having some pain over his neck and some pain running down his arm." He was "a little bit stiff and sore." (Emphasis added). Two months later, Plaintiff again reported "[g]etting along fairly well, although he did have "some pain in his neck [and] some stiffness and soreness down into his back as well." (Emphasis added).

The undersigned therefore finds that the evidence does not show that Plaintiff's change in condition caused a significant change in his actual symptoms or limitations.

Additionally, the State agency reviewing physicians in 2003 also found Plaintiff could still work at the light exertional level.

The undersigned therefore finds that, although Plaintiff's condition may have worsened, substantial evidence supports the ALJ's determination that he could still perform limited light work.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 10] be **GRANTED**, Plaintiff's Motion for Summary Judgment [Docket Entry 9] be **DENIED**, and this matter be dismissed from the court's docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection. A copy

of such objections should be submitted to the Honorable Irene M. Keeley, Chief United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above

will result in waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn,

474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and

Recommendation to counsel of record.


Respectfully submitted this ___16___ day of January, 2007.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE